# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hayden Royal LLC, *et al.*, | No. CV-20-02388-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Justin Hoyt, *et al.*, | |
| Defendants. | |

Plaintiff Hayden Royal LLC ("Hayden Royal") initiated this action alleging federal theft of trade secrets and related state law claims. ("Complaint," Doc. 1.) Immediately thereafter, Plaintiff moved for a Temporary Restraining Order and Preliminary Injunction ("Motion," Doc. 2), seeking to stop Defendants Justin Hoyt and Jason Jensen from using or disclosing Plaintiff's trade secrets and protected confidential information, and from soliciting its clients. That Motion, along with Defendants' Response in opposition ("Response," Doc. 12), and Plaintiff's Reply in support ("Reply," Doc. 14), are now at issue, as is Plaintiff's Motion to Strike Defendants' Notice of Filing of Witness Declarations (Doc. 23). After allowing the parties time to fully brief the Motion and prepare, the Court held a telephonic Preliminary Injunction hearing on January 5, 2021, where it heard evidence and argument. (Doc. 29.)

## I.   FACTS AND BACKGROUND

Plaintiff is an SEC-registered investment advisory firm headquartered in North Carolina with offices elsewhere in the United States, including one in Gilbert, Arizona.

Until February of 2019, Defendants were employed as investment advisors with Wells Fargo.

Defendants entered into employment negotiations with Louis Dworsky, Plaintiff's Managing Member, in late 2018 and entered employment agreements on February 21 (Hoyt) and February 25 (Jensen), 2019. (Motion, Exh. 1.) The documents, denominated "Employment, Confidentiality and Non-Solicitation Agreements," set forth in relevant part Defendants' job descriptions as employees of Plaintiff, compensation structure, and referenced the loans that Plaintiff had made to each Defendant upon their entry on duty with Plaintiff.[1] The agreements also each provided that Defendants would maintain confidentiality of all of Plaintiff's proprietary information, which included client information, business methods, pricing formulae, training curriculum, policies and procedures. Finally, the agreements contained a provision prohibiting Defendants from soliciting Plaintiff's clients for 2 years after they departed Plaintiff's employ, and at any time while Defendants still owed any balance on their respective loans.

The parties point to additional documents they argue are germane to the claims and defenses. Defendants introduced evidence at the hearing that prior to their beginning employment with Plaintiff, Plaintiff and Defendant Hoyt—but not Defendant Jensen—had signed an earlier "Letter of Understanding" on January 17, 2019, providing that all clients brought into Hayden Royal by Defendants were Defendants' clients, and not Plaintiff's clients. (Response, Exh. 3 at 22.) Plaintiff introduced evidence that later, on October 6, 2020, the parties also executed Additional Letters of Understanding, providing that the terms of their Employment, Confidentiality and Non-Solicitation Agreements remained in full force and effect. (Motion, Exh. 1 at 53-56.) Defendant Jensen's Additional Letter of Understanding—but not Defendant Hoyt's—also contained a new provision requiring him to "acknowledge that all clients and client assets belong to the firm."

---

[1] Plaintiff initiated a $925,000 loan to Defendant Hoyt, for which he executed a promissory note. (Motion, Exhibit 1 at 24.) Plaintiff also initiated a $250,000 loan to Defendant Jensen, for which he also executed a promissory note. (Motion, Exh. 1 at 47.)

The parties dispute the effect of each of these letter agreements on their rights and obligations, and it is possible that discovery may yield information that makes it necessary to resolve the operation of each of these documents on the final merits of this case. Based on the Court's conclusions as set forth below, it need not resolve these arguments to determine whether to grant the injunctive relief sought.

Plaintiff is a signatory to the Protocol for Broker Recruiting ("Protocol").[2] The Protocol provides that, if certain conditions are met, a signatory firm agrees not to enforce its rights regarding non-solicitation of clients against financial advisors that depart the firm for another signatory firm. (Response, Exh. 3 at 26-28.) Specifically, the Protocol provides that:

> If departing [financial advisors] and their new firm follow this protocol, neither the departing [financial advisor] nor the firm that he or she joins would have any monetary or other liability to the firm that the [financial advisor] left by reason of the [financial advisor] taking the information identified below or the solicitation of the clients serviced by the [financial advisor] at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding."

(Response, Exh. 3 at 26.). Under the Protocol, departing financial advisors are permitted to take certain client information:

> When [financial advisors] move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch

---

[2] Although Plaintiff did not expressly acknowledge in its moving papers its status regarding the Protocol, Plaintiff's Managing Member acknowledged at the Motion hearing that Plaintiff is a signatory. (Doc. 35 at 20:24-21:2.) ("Q: Would you say that you are currently with a firm that is a member of the Protocol for member recruiting? A: Hayden Royal is a member.")

- 3 -

> management and shall include a copy of the Client Information that the [financial advisor] is taking with him or her."

(Response, Exh. 3 at 26.) Thus, when a financial advisor resigns under the Protocol, he is obligated to provide his former firm with a resignation letter and attach a list that includes all of the Client Information he intends to take (a "Protocol list"). *See* Response, Exh. 3 at 26. The Protocol further provides that:

> In the event that the [original] firm does not agree with the [departing financial advisor's] list of clients, the [financial advisor] will nonetheless be deemed in compliance with this protocol so long as the [financial advisor] exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

(Response, Exh. 3 at 26.)

As for the departing financial advisor and his new firm's use of the relevant client information, the Protocol states that:

> [T]he new firm will limit the use of the Client Information to the solicitation by the [financial advisor] of his or her former clients and will not permit the use of the Client Information by any other [financial advisor] or for any other purpose.

(Response, Exh. 3 at 26.) Additionally, the Protocol also provides that:

> [Financial advisors] that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing [financial advisor] before he or she has left the [former] firm.

(Response, Exh. 3 at 26.)

On October 2, 2020, Defendants submitted letters of resignation to Plaintiff and joined Juncture Wealth, another signatory to the Protocol. There is no dispute that Defendants engaged in actions surrounding their departure for Juncture Wealth that

violated the Protocol, including soliciting some clients to move their accounts to Juncture Wealth before they had left Plaintiff's employ.

Defendants rescinded their resignations in writing on October 6, 2020. (Motion, Exh. 1 at 53-56.) Plaintiff agreed in the Additional Letters of Understanding that Defendants' Employment, Confidentiality and Non-Solicitation Agreements of February 2019 remained "in full force and effect." (Motion, Exh. 1 at 54 (Hoyt), 56 (Jensen).) As noted above, Defendant Jensen's Additional Letter of Understanding contained an acknowledgement that "all clients and client assets belong to the firm."

Defendants continued to work for Plaintiff for approximately two months thereafter. On December 4, 2020, each Defendant submitted a letter of resignation to Plaintiff, indicating he was joining Ameriprise Financial Services, another signatory to the Protocol. (Motion, Exh. 1 at 58, 60.) In their letters, Defendants noted they had attached client lists pursuant to the Protocol. In total, Defendants solicited approximately 100 client relationships, comprising approximately 200 clients, from their time with Defendants to move their accounts from Plaintiff to Ameriprise. Nearly all of those clients moved their accounts.

Plaintiff brought the instant action claiming Defendants violated the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*. (Count 1); misappropriation of trade secrets under A.R.S. 44-401 *et seq*. (Count 2); breach of their employment contracts (Count 3); breach of the promissory note (Count 4); breach of the implied covenant of good faith and fair dealing (Count 5); breach of Defendants' duty of loyalty and confidentiality (Count 6); tortious interference with business relationships (Count 7); and unjust enrichment (Count 8). Plaintiff bases its request for an injunction on all of these claims.

**II.   LEGAL STANDARD**

To qualify for temporary injunctive relief, a movant must demonstrate: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of hardships tips in its favor; and 4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The

1  Court alternatively may grant temporary injunctive relief where it finds "serious questions
2  going to the merits" exist and a "balance of hardships that tips sharply towards the
3  plaintiff," and the second and fourth *Winter* factors are satisfied. *Alliance for Wild Rockies*
4  *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**III.   DISCUSSION**

The parties acknowledged at the hearing that all of Plaintiff's claims underlying its request for a Preliminary Injunction Order hinge on whether Defendants' actions in: 1) taking certain information from Plaintiff; and 2) soliciting clients of Plaintiff; were permitted or not under law as applied to the facts of this matter. The information Defendants may have taken that constituted trade secrets under the federal Defend Trade Secrets Act and or the Arizona Uniform Trade Secret Act, or was deemed protected as confidential under the Employment Agreements, falls into two categories. First, the "Client Information," including names, mailing addresses, telephone numbers, email addresses and account titles that Defendants would be permitted to take if the Protocol were operative. Plaintiff produced evidence, and Defendants acknowledge that they took this information.

Second, information – client birth dates and social security numbers – that Defendants are not permitted to take even if the Protocol is in force. Plaintiff alleged, and Defendants dispute, that Defendants also took this information. Although Plaintiff further alleged Defendants took other Hayden Royal proprietary information, such as training curriculum, policies, and pricing and other business materials, it put no evidence before the Court that Defendants took or possessed these types of information upon their departure from Plaintiff on December 4, 2020. Thus, the Court's analysis regarding the taking of information will be limited to the topic of "Client Information" as identified under the Protocol as well as client birth dates and social security numbers.

Plaintiff argues that any solicitation or Client Information taken pursuant to the protocol was improper because the protocol did not apply to Defendants due to their violations in October. They further argue that the solicitation was not done pursuant to the protocol and that the second category of information is not protected by the protocol.

Finally, Plaintiff argues that the Protocol does not apply to any of Defendants' actions due to Defendants' bad faith.

For the following reasons, the Court does not find any of these arguments persuasive to grant Plaintiff's request for a preliminary injunction. The Court concludes as set forth below that Plaintiff has failed to demonstrate the actions Defendants took would constitute a violation of the Protocol. The Court further concludes that Plaintiff has not produced sufficient evidence that Defendants took any action outside of the protections of the Protocol.

### A.   Taking of Client Information and Soliciting Clients as Protected by the Protocol

Defendants' solicitation of clients and their taking of Client Information would be governed by the agreements between Plaintiff and Defendants—the January 17, 2019, Letter of Understanding; the February 21 and 25, 2019 Employment, Confidentiality and Non-Solicitation Agreements; and the October 6, 2020 Additional Letters of Understanding—if the Protocol was not in operation. In that event, the Court would be required to determine which of the above agreements were enforceable in whole or in part, and if provisions among the agreements conflicted, which would prevail.

If, on the other hand, the Protocol's protections remained in force and Defendants' actions did not violate it, the parties agree—and the Court in any event concludes, pursuant to *Credit Suisse Securities (USA) LLC v. Lee*, No. 11 CIV 08566 RJH, 2011 WL 6053108 at *3 (S.D.N.Y. Dec. 9, 2011)—that notwithstanding any otherwise applicable non-solicitation or confidentiality restriction agreements, Defendants would be permitted to take the Client Information for the clients they serviced while in Plaintiff's employ and solicit those clients to move to Ameriprise, after they had resigned from Plaintiff and begun working at Ameriprise. Thus, as the parties clearly recognized in their presentations to the Court, a showing of likelihood of success on the merits largely turns on whether Defendants violated the Protocol through their actions or not. Considering the evidence presented thus

far, the Court concludes Plaintiff has not demonstrated that Defendants likely violated the Protocol.

As the Court noted above, there is no doubt that, prior to their resignations from Plaintiff to join Juncture Wealth in October 2020, Defendants violated the Protocol. Defendants acknowledged that they solicited present clients to move with them to Juncture before they left Hayden Royal's employ, took information beyond that allowed by the Protocol in preparation to depart for Juncture, downloaded it to a computer purchased with funds provided by Juncture while still employed by Plaintiff, for the purpose of taking those clients from Plaintiff, and even used Plaintiff's offices while still in its employ to meet clients who were signing paperwork to move their accounts to Juncture. All of these actions violated the Protocol as to Defendants' move to Juncture. And the Court would easily conclude that the Protocol offered Defendants no protection from suit by Plaintiff for their actions before and during their move to Juncture.

But that move is not the source of the harms Plaintiff now asserts. Within days of resigning, Defendants rescinded their resignations, and by all parties' accounts, "begged" to be allowed to return to Plaintiff, with their clients. Plaintiff agreed and reinstated Defendants, acknowledging in the October 6, 2020 Additional Letters of Understanding with each Defendant that the terms of their employment agreements were in full force. Defendants then continued to work for Plaintiff—not Juncture—for approximately two more months before moving to a different, unrelated employer.

Plaintiff argues that once an employee financial advisor subject to the Protocol violates it, the taint of that violation forever follows him or her—even, as here, when the employee violates the protocol in preparation for joining one contemplated new employer, then terminates that employment and returns to work for his old employer, then leaves again for a new employer after some period. In support of this argument, Plaintiff states there is an absence of case law holding otherwise. The Court notes it found no case law supporting Plaintiff's position either. And in evaluating the language of the Protocol, the Court concludes Plaintiff's interpretation of the Protocol cannot prevail.

      The Protocol is, as the parties agreed at the hearing, a contract between two signatories—the original firm the employee leaves and the new firm the employee joins—with the transitory employees as third-party beneficiaries. By its clear terms, the Protocol protects, or not, financial advisor employees ("registered representatives," in the Protocol's parlance) and their new firm from liability for their actions in relation to the specific move from the former firm to the new firm. The relevant language of the Protocol quoted above makes this clear with its repeated references to the employees' moving "to their new firm." The Court cannot logically read this language to mean that any past violation of the Protocol by an investment advisor in connection with a specific prior move creates a "taint" that infects any subsequent moves to different and unrelated employers, where no violations specific to those later moves are shown.

      Had Defendants moved a second time to Juncture Wealth in December 2020, the Court's analysis would be different. But the Protocol's protections and the removal of those protections are clearly predicated on the actions of the parties and beneficiaries pertaining to a specific "move." Therefore, the only violations or bad faith acts by Defendants occurring in relation to Defendants' prior aborted move to Juncture are immaterial for purposes of establishing whether the Protocol's protections apply to the Defendants' move to Ameriprise. Such acts that would remove the Protocol's protections in this matter are those undertaken in the service of Defendants' move to Amerisave—the "new firm." Because there is no evidence of these acts at this stage of the litigation, the Court finds that the Protocol permitted Defendants to take Client Information and solicit clients after joining the new firm without liability.

      **B.**    **Taking of Information Beyond the Protocol's "Client Information"**

      While Plaintiff asserts that Defendants took additional information beyond that allowed under the Protocol—specifically client social security numbers and dates of birth—it has not presented evidence sufficient for the Court to so conclude. Ms. Michelle Wine, office manager at Plaintiff's Gilbert location, provided two sworn declarations in this matter, the second of which stated that on December 29, 2020, about 25 days after

Defendants resigned from Plaintiff to join Ameriprise, she spoke by telephone with Mr. and Ms. G.B., Hayden Royal clients who had decided to move their accounts to Amerisave. (Doc. 17 at 19-20.) At this point, Plaintiff had received transfer forms from Amerisave containing G.B.'s social security number and date of birth, and during the call, Ms. Wine states she asked the couple if Defendant "Hoyt already had the client and spouse's social security numbers and dates of birth when they signed transfer paperwork to Ameriprise," and G.B. responded, "Yes." (Doc. 17 at 19-20.)

During her cross-examination at the Preliminary Injunction hearing, Ms. Wine testified Mr. and Ms. G.B. made Hayden Royal aware of their desire to move to Amerisave in approximately mid-December 2020, approximately two weeks before she asked the couple about their personal information. (Doc. 35 at 70:20-22.) She testified that she did not know how many times Mr. and Ms. G.B. had met with Defendants between when Defendants left Plaintiff's employ on December 4 and when she spoke to the couple on December 29 (Doc. 35 at 71:8-11), what information G.B. and his spouse provided defendants during any of those meetings (Doc. 35 at 71:12-15), or whether G.B. or his spouse provided the personal information directly to Defendants during any of their telephone conversations with Defendants (Doc. 35. at 72:23-73:6), either before or at the time they signed the account transfer forms (Doc. 35 at 73:10-11). Defendant Hoyt submitted a supplemental declaration stating that G.B. voluntarily provided him with the couple's personal information "for the purpose of transferring their accounts to Ameriprise." (Doc. 19 at 13.) Plaintiff did not cross-examine him on this issue at the hearing.

Ms. Wine also stated in her supplemental declaration that on December 29, 2020, she spoke with another client, C.L., who had emailed Plaintiff five days prior on December 24, stating he would be moving his account to Defendants at Ameriprise. (Doc. 17 at 20.) Plaintiff received the transfer forms that same day. Ms. Wine had checked the forms and noted C.L.'s social security number was incorrect, so she called him. Ms. Wine declares that during the call, she asked C.L. and his spouse "whether they had provided their social

security numbers to Hoyt to complete the paperwork," and they answered that they "did not recall providing this information to Hoyt and believed that he had all of the information already." (Doc. 17 at 20.)

On cross-examination, Ms. Wine testified that she did not know how many times C.L. and his spouse met with or spoke to Defendants between their resignation from Hayden Royal on December 4 and the time they signed the account transfer papers bearing their personal information on December 24, nor whether they shared their personal information with Defendants during any of those conversations. (Doc. 35 at 77:6-22.) She also clarified her declaration statement regarding her December 29 conversation with C.L., testifying that she had both C.L. and his spouse on a speaker phone, and when she asked them

> If [Mr. and Ms. C.L.] had to provide this information to the defendants or if they [Defendants] already had it. They went back and forth. C.L. stated that he did not remember having to provide this information and Ms. C.L. stated that she believes [Defendants] already had the information.

(Doc. 35 at 78:17-25.)

Defendant Hoyt stated in his Supplemental Declaration that C.L. and his spouse provided him with social security numbers and dates of birth, as well as other personal information "on multiple occasions in order to transfer their accounts from Hayden Royal to Ameriprise." (Doc. 19 at 14.) Hoyt declares that these occasions were, first, over the telephone "during [Hoyt's] initial call to C.L. following [Hoyt's] resignation from Hayden Royal," when C.L. indicated he wished to move his accounts, and Hoyt took C.L.'s personal information during the phone call, and thereafter when Hoyt met with C.L. and his spouse in person at their home and took down the information again. (Doc. 19 at 13.)

In summary, to support its contention that Defendants took information from Plaintiff in excess of that allowed under the Protocol, in the form of client social security numbers and birth dates, Plaintiff presents only hearsay statements. The Court can and does consider this evidence in the context of a Preliminary Injunction hearing. But, it does so

fully aware of the questionable reliability of such evidence when it has not been subjected to testing through cross-examination. This consideration affects the weight to be given to the testimony, especially where the witness relaying the conversation, Ms. Wine, acknowledges that at least one set of client declarants has memory issues due to age. (Doc. 35 at 74:9-12.)

Defendant controverts that evidence with his own first-person declaration—which Plaintiff did not challenge or test during cross-examination—that the clients both gave him their personal information voluntarily for the purposes of transferring the accounts to Amerisave, and that they did so after he left Hayden Royal and joined Amerisave. Thus, the resolution of this issue that is critical to determining whether Defendants breached the Protocol by taking client personal information reduces to a credibility determination between one witness's direct testimony and the hearsay statements offered by the opponent. While this Court, when in the role of factfinder, regularly must make credibility determinations as between witnesses, it will not, in the course of determining whether to exercise the extraordinary authority to grant injunctive relief, do so without adequate information to substantially guarantee the trustworthiness of the substance of those hearsay statements.[3]

---

[3] Such adequate information may present itself as the case develops. If, for example, G.B., C.L. and or their spouses are deposed during the discovery phase or testify at trial and their recollections are tested through cross-examination, they may well affect the credibility determination for the finder of fact at that time. But that is not the evidentiary situation before the Court at present.

The Court notes that Plaintiff also presented evidence that on October 20, 2020, approximately two weeks after Defendants rescinded their resignations and returned to the employ of Plaintiff, Defendant Hoyt used Ms. Wine's custodian account to generate a report of all Hayden Royal clients, which included client names, dates of birth, social security numbers, account numbers and account values. (Doc. 17 at 25.). While this evidence provides an additional piece of circumstantial evidence that Defendant Hoyt had client personal information available to him some six to seven weeks before departing Hayden Royal on December 4, it is insufficient at this stage to overcome the concerns the Court has set forth above, especially in light of Defendant Hoyt's plausible declaration that he had a legitimate need to access that information to service his clients at that point, and his own computer access had not yet been restored. (Doc. 19 at ¶¶ 30-31.)

### C. Alleged Solicitation of Clients before Moving to Amerisave

Plaintiff alleges in its Complaint and argued in the Preliminary Injunction proceedings that Defendants violated the Protocol, and thus vitiated its protections, by soliciting clients before they left Plaintiff's employment. But the only evidence they presented of such pre-exit solicitation pertained to Defendants' earlier October departure for Juncture Wealth, which the Court has concluded is not the move that is the subject of the Protocol protections in the Amerisave transition. While Plaintiff argues in its briefing and at the hearing that Defendants "very likely" solicited clients ahead of their December 4 departure for Amerisave, that argument is based on conjecture that because Defendants did it before, in their October departure for Juncture, they must have done it again. This is precisely what Rule 404(b)(1) of the Federal Rules of Evidence precludes: using prior bad acts to prove a person's character in order to show that on a particular occasion—here, the December departure to Amerisave—the person aced in accordance with that character trait. Again, the Court recognizes that the Rules of Evidence do not preclude consideration of this evidence in the context of a Preliminary Injunction hearing; it nonetheless is unpersuaded at this juncture, without some persuasive corroboration, that Defendants' prior bad acts are an adequate justification to find they solicited clients before joining Amerisave.[4]

### D. Other Actions Alleged to Constitute Defendants' Bad Faith

Finally, Plaintiff urges that Defendants engaged in other actions that constitute "bad faith" within the Protocol's meaning, resulting in removal of its protections. Those other actions include: (1) Defendants' advice to Mr. Dworsky in November 2020 to extend Plaintiff's building lease for three years, which Plaintiff argues implied that Defendants intended to stay on with Plaintiff long-term; (2) Defendants "wiping" their company-issued iPads; (3) Defendants' extensive deletion of thousands of emails from their company accounts; and (4) Defendants' efforts to contact clients to seek "updated" contact information

---

[4] Again, discovery may yield additional affirmative evidence tending to prove that Defendants solicited clients for their move to Ameriprise before their December 4 resignations from Plaintiff, but no such evidence is before the Court for its present purposes.

in the weeks leading up to their departure. The Court does not find any of these actions constitute bad faith within the meaning of the Protocol on the evidence now before it.

First, Defendants were under no obligation, upon their return to Plaintiff's employ in October 2020, either to stay for any set period of time or to advise Plaintiff they may be contemplating leaving again. Second, Defendants acknowledged "wiping," or resetting, their company issued iPads in October upon their departure for Juncture Wealth but assert in Hoyt's declaration that neither used his iPad thereafter. If true, Defendants took no action related to the "move" at issue—the move to Amerisave in December—involving the iPads. Plaintiff's mere supposition, unaccompanied by any other evidence, such as forensic evaluation of the iPads or the firm's network communication logs, is insufficient to overcome Defendants' denial that they used and then again "wiped" the iPads in December.

Third, Plaintiff offers only conjecture that Defendants' deletion of their emails from their Hayden Royal accounts was for the purpose of concealing improper actions such as pre-soliciting clients. Defendant Hoyt's declaration and testimony that he deleted stale emails as a regular business and personal management practice is a plausible explanation, especially in the absence of controverting evidence of an improper purpose. Plaintiff's counsel acknowledged that he was unaware that any forensic review of Defendants' deleted messages in Plaintiff's email archives for the immediately preceding two months had yielded any evidence of client pre-solicitation or other wrongdoing. And fourth, without more, evidence that Defendants contacted their clients to seek updated contact information in the months before they left Plaintiff is at least as likely to allow for effective client communication and servicing as it is to lay the groundwork to poach clients. The Court will not conclude from this evidence and argument that the above acts show Defendants' bad faith within the meaning of the Protocol.

For all of the above reasons, the Court finds in light of the current state of evidence before it that Plaintiff is unlikely to succeed on the merits in proving its federal claim under the Defend Trade Secrets Act or its state trade secret or contract claims. Without any of those predicates Plaintiff also is unlikely to succeed in its associated tort claims. Plaintiff

therefore cannot satisfy the *Winter* factors. Nor does the Court find that Plaintiff's evidence thus far presents "serious questions going to the merits" to satisfy *Cottrell*'s alternate formulation for the awarding of preliminary injunctive relief. The Court therefore will deny Plaintiff's Motion for a Preliminary Injunction.

## IV.   Plaintiff's Motion to Strike

Also before the Court is Plaintiff's Motion to Strike Defendant's Notice of Filing of Witness Declarations (Doc. 23), which the Court will treat as a Motion in Limine to preclude Defendants from introducing or mentioning, or the Court from considering, a redline draft version of the October 6, 2020 Additional Letter of Understanding between Plaintiff and Defendant Hoyt, which contained comments from Plaintiff's counsel, Mr. Neuman. The parties agree on the following facts relevant to the Court's determination of the issue.

On October 5, as Plaintiff and Defendants discussed recission of Defendants' resignations and their return to Plaintiff's employment, Mr. Dworsky directed Ms. Wine to contact Mr. Neuman about the adequacy of the Additional Letter of Understanding Mr. Dworsky had drafted. Ms. Wine did so and obtained from Mr. Neuman a copy of the draft with Mr. Neuman's commentary opinion, in the margins, on whether certain terms proposed by Mr. Dworsky were legally enforceable. She presented the redline draft to Mr. Dworsky, who at some point thereafter directed her to dispose of it, which she did by placing the draft in the locked shred box at Plaintiff's Gilbert office. Defendant Hoyt thereafter opened the shred box, found the draft, removed, and retained it, relying on its contents to argue the Preliminary Injunction issue before the Court.

Plaintiff seeks a ruling that the draft is inadmissible under the attorney client privilege. Defendant opposes such a ruling, arguing that the privilege either never attached to the draft or was waived because Ms. Wine's interjection into the communications between Mr. Dworsky, on behalf of Plaintiff, and Mr. Neuman as Plaintiff's counsel, negates the confidentiality of the communication.

Rule 501, Fed. R. Evid. provides that in a civil case, state law regarding privilege shall apply as to any state law claims. For federal claims, Rule 501 provides that the federal common law of privilege will govern. There is no material difference between federal common law and Arizona or North Carolina state law regarding the elements of attorney client privilege.

The attorney client privilege protects from disclosure or use: 1) a communication; 2) between an attorney and his client; 3) made in confidence; 4) for the purpose of either seeking or giving legal advice. *S. Union v. Sw. Gas Corp.*, 205 F.R.D. 542, 546 (D. Ariz. 2002); *Clements v. Bernini ex rel. Superior Court*, 471 P.3d 645, 650-51 (Ariz. 2020); *Gunter by Zeller v. Maurer*, 826 S.E.2d 557, 560-61 (N.C. App. 2019). In the context of an organizational client, such as Hayden Royal, the organizational client acts through its constituents—here, the Managing Director.

Requirements 1, 2, and 4 are not in issue for purposes of determining the Motion. There was a communication—a draft of the letter prepared by Hayden Royal with its counsel's evaluation of the legality of its provisions. The communication was between an attorney, Mr. Neuman, and his client, Hayden Royal, acting through its Managing Partner. And as noted above, the communication was for the purpose of providing legal advice— in this case, whether in counsel's view, the law supported the provisions of the letter the client wished to include. The parties disagree on whether third requirement is met—that the communication of the letter with counsel's comments was made "in confidence." Defendant argues that Ms. Wine, whether acting as office manager or as administrative assistant, is not a necessary party to the communication between Mr. Dworsky, as the client's highest officer, and its counsel. Plaintiff counters that Mr. Dworsky delegated to Ms. Wine the duty to communicate with Mr. Neuman on the client's behalf, and therefore represented the client as a member of management.

Whether or not Ms. Wine is in fact a member of management is immaterial to the analysis. Regardless of the title of a person who is party to the communication, their presence during the communication will not destroy the privilege if it was necessary to

- 16 -

1  facilitate the communication. Mueller, Evidence – Practice Under the Rules, 4th ed. § 5.13
2  (2019). This is true whether the additional person present is the agent of the attorney or the
3  communicative intermediary of the client. *Id*. Courts have consistently held this includes
4  assistants to executives interacting with counsel on behalf of organizational clients. *See*
5  *e.g. Abbott Laboratories v. Airco, Inc.*, 1985 WL 3596 at *4-5 (N.D Ill. Nov. 4, 1985)
6  (holding that "a recognized exception to the rule that the communication must be directly
7  between the client and attorney is for ministerial agents of the attorney (such as clerks,
8  secretaries and stenographers) or of the client who facilitate transmission of the
9  communication."). The interposing of Ms. Wine into the communication between Messrs.
10 Dworsky and Neuman thus does not destroy the privileged nature of the communication.
11 Executives frequently do not open their own mail, answer their own telephone lines, initiate
12 or receive their own faxes or even emails. Administrative assistants perform these functions
13 for executives, and in this capacity, they are necessary to facilitate the transmission of the
14 communication. Thus, the communication here was made "in confidence" within the
15 meaning of the attorney client privilege doctrine. The Court will grant the Motion to Strike
16 insofar as it will exclude from consideration in this matter the redline draft of the Additional
17 Letter of Understanding itself or any mention or argument regarding it.

18 **IT IS ORDERED** denying Hayden Royal's Motion for a Temporary Restraining
19 Order and Preliminary Injunction (Doc. 2).

20 **IT IS FURTHER ORDERED** granting in part Plaintiff's Motion to Strike
21 Defendant's Notice of Filing of Witness Declarations (Doc. 23) as set forth immediately
22 above.

23 Dated this 22nd day of January, 2021.

Honorable John J. Tuchi
United States District Judge